**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ASHLEY WALLS, | ) | |
| Plaintiff, | ) | 1:10-cv-2542 |
| | ) | |
| v. | ) | Judge Zagel |
| | ) | |
| NCO FINANCIAL SYSTEMS, INC., | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | JURY DEMANDED |

**PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACT**

1. **NCO Financial Systems, Inc., ("NCO") is a debt collection agency.**

Exhibit A, Answer at ¶ 7.

2. **Plaintiff is an individual who resides in Chicago, Illinois, and her cellular telephone number is 314-xxx-0113.**

Exhibit B Pl. Resp. NCO Discovery at Interrogatory 2 and Request for admission 1.

3. **At all times when NCO called plaintiff's cellular telephone, plaintiff's outgoing voice mail greeting stated that the caller had reached "Ashley Walls."**

Exhibit B, at Int. 16, 21 & 22.

4. **NCO called plaintiff's cellular telephone seventy-four times within four years of the filing of this complaint.**

See generally, Exhibit C, NCO Supplemental Discovery Responses at interrogatory 1.

5. **NCO left sixty-two prerecorded messages for plaintiff on her cellular telephone, each within four years of the filing of this complaint.**

See generally, Exhibit C, NCO Supplemental Discovery Responses at interrogatory 1.

1

6.      Each of these prerecorded messages was nearly identical, recorded ahead of time, and played automatically when NCO believed someone or something had answered plaintiff's phone.

Exhibit D, Deposition of Greg Stevens given in this case ("Stevens Depo I"), at 10-11, 14.

7.      Each of the above-mentioned calls were made with one of two dialers NCO uses: its Guaranteed Contacts ("GC") dialer, and its Soundbite dialer.

Exhibit C at Supp. Resp. Int. 1.

8.      The GC dialer is capable of dialing telephone numbers without human intervention.

Exhibit D, Stevens Depo I at 6-11.

Exhibit E, Deposition of Greg Stevens given in *Donnelly v. NCO Financial Systems, Inc.*,

        1:09-cv-2264 (N.D.Ill.) ("Stevens Depo II"), at 6-7, 16.

9.      The Sountbite dialer also capable of dialing phone numbers without human intervention.

Exhibit D, Stevens Depo I at 13;

Exhibit E, Stevens Depo II at 6-7, 15.

10.     Each of the sixty-two recorded message voice mail messages NCO left on plaintiff's voice mail were recorded ahead of time, and then the recordings were played when plaintiff's voice mail picked up.

Exhibit D, Stevens Depo I at 11-12;

Exhibit F, recordings.

2

11. **Whenever NCO uses its dialers and recorded messages, it intends to make such calls, and the calls to the 0113 were intentional, too.**

Exhibit D, Stevens Depo I at 17.

Exhibit E, Stevens depo II at 28;

**12. Although NCO claims that some calls it made were "manual" calls, those calls were placed and dialed by the GC Dialer, through use of the same dialing system that made the automated calls.**

Exhibit D, Stevens Depo I at 9-10.

13. **There was an NCO employee on the phone for the approximately six "manual" calls to plaintiff's cell phone, who left a "live," non-prerecorded, message on plaintiff's voice mail.**

Exhibit C at Supplemental Interrogatory 1;

Exhibit D at 9-11.

14. **Despite that human beings were present on NCO's end of the telephone line for the "manual" calls, and that plaintiff's outgoing greeting told the NCO employee on the line that she had reached "Ashley Walls", NCO kept calling plaintiff's phone number.**

See generally, Exhibit C at Supp. Int. 1; .

15. **NCO is not aware of any evidence that might suggest that Ashley Walls provided "prior express consent" to be called on her cell phone, 314-xxx-0113.**

Exhibit D, Steves Depo I at 29.

16. **This Court has federal question subject matter jurisdiction because this case is brought pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §227 et seq., and the**

**Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., both of which are federal laws. 28 U.S.C. §1331.** Exhibit A, Answer at ¶4.

17. **Venue is proper because plaintiff resides in this District, and received defendant's illegal calls while within this District.** Exhibit B at Interrogatory 1; Exhibit A, answer at ¶5.

Respectfully submitted,

/s/Alexander H. Burke

**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEY WALLS, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Zagel |
| | ) | |
| - vs- | ) | Case No.:     10 CV 2542 |
| | ) | |
| NCO FINANCIAL SYSTEMS, INC., | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendant. | ) | |

## NCO'S ANSWER AND AFFIRMATIVE DEFENSES

NOW COMES defendant NCO Financial Systems, Inc. (NCO) by and through undersigned counsel, and for its answer to plaintiff's complaint, states as follows:

1.     The defendant debt collector called plaintiff Ashley Walls on her cell phone more than 35 times using an autodialer and/or prerecorded message. Plaintiff has preserved several of the voice mail messages NCO left for her.

**Answer:**     **NCO denies that it uses equipment or messages subject to the Telephone Consumer Protection Act (TCPA). NCO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of ¶ 1, which has the effect of a denial.**

2.     Upon information and belief, NCO was attempting to call some person other than plaintiff. The illegal calls persisted, however, despite the fact that plaintiff's outgoing voice mail message states that the caller has reached "Ashley Walls." The person or persons NCO was trying to call was not named Ashley Walls.

**Answer:      NCO admits only that it was not attempting to call Ashley Walls. NCO denies that any of the calls it allegedly placed to Ashley Walls were illegal. NCO is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of ¶ 2, which has the effect of a denial.**

3.      Plaintiff seeks statutory damages for each violation pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227(b); statutory and actual damages under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"); and actual and punitive damages under a common law invasion of privacy theory.

**Answer:      NCO admits that plaintiff purports to bring claims under the FDCPA, TCPA and common law, but denies any violations, wrongdoing or liability under the law and denies the allegations of ¶ 3.**

4.      This Court has federal question subject matter jurisdiction over the FDCPA claims and the TCPA claims under 28 U.S.C. §§1331, 1337, and 15 U.S.C. §1692k; *Brill v. Countrywide Home Loans, Inc*., 427 F.3d 446 (7th Cir. 2005).   There is also supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims, and the TCPA claims, if necessary.

**Answer:      NCO admits the allegations of ¶ 4 for jurisdictional purposes only.**

5.      Venue is proper because a substantial portion of the events complained of occurred in this District.

**Answer:      NCO admits the allegations of ¶ 5 for venue purposes only.**

6.      Plaintiff  is an individual who resides in this district.

**Answer:** **NCO is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 6, which has the effect of a denial.**

7.      NCO Financial Systems, Inc. ("NCO") is a debt collection agency that does business in this District. Its registered agent in Illinois is CT Corporation System, 208 LaSalle Street, Suite 814, Chicago, IL 60604.

**Answer:** **NCO admits the allegations of ¶ 7.**

8.      Defendant has made more than 35 telephone calls to plaintiff's cellular telephone. Upon information and belief, NCO attempted at least thirty-eight such calls. The telephone plan is in plaintiff's stepfather's name, and is part of a multi-line "family plan." Plaintiff carried the phone at all relevant times herein, and was the person subjected to the defendant's violations.

**Answer:** **NCO is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 8, which has the effect of a denial.**

9.      Upon information and belief, NCO used a telephone system whereby no human being dialed plaintiff's telephone number to make the calls. That system is referred to herein as the "dialer".

**Answer:** **NCO denies the allegations of ¶ 9.**

10.      Some or all of the calls to each plaintiff were made with one of NCO's dialers.

**Answer:** **NCO is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 10, which has the effect of a denial.**

11.    For some or all of those calls, NCO left or attempted to leave voice mail messages.  Plaintiff has preserved recordings of some of those voice mail messages.

**Answer:    NCO is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 11, which has the effect of a denial.**

12.    Upon information and belief, NCO was calling plaintiff's cell phone in attempts to contact one or more persons other than plaintiff.

**Answer:    NCO is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 12, which has the effect of a denial.**

13.    At all relevant times, plaintiff's outgoing voice mail message stated that the caller had reached "Ashley Walls." NCO continued to call, despite this.

**Answer:    NCO is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 13, which has the effect of a denial.**

14.    NCO uses its dialers and prerecorded messages in order to increase efficiency.

**Answer:    NCO admits only that it uses dialers and recorded messages in part to increase efficiency.**

15.    NCO programmed its dialer to dial plaintiff's phone number, even though it may, or may not, have known specifically who was receiving the calls.  In this sense, NCO intended to place the calls that are the subject of this lawsuit.  Similarly, NCO intended that its dialer(s) leave voice mail messages on the voice mail of the person using plaintiff's cell phone number.  All of the voice mails that NCO's dialer left on plaintiff's

voice mail were "automated" in the sense that they had been recorded previously, and NCO's dialer played the recording.

**Answer:** **NCO is without sufficient knowledge or information to form a belief as to the truth of the allegations that it was calling plaintiff's cell phone, which ahs the effect of a denial. NCO denies the remaining allegations of ¶ 15.**

16. The TCPA does not restrict calls to cell phones that are dialed by humans, and where humans are present on the line when the person called (or his voice mail) picks up. In continuing to use its dialers, NCO puts law-abiding debt collection agencies at a competitive disadvantage. These illegal systems are vastly more efficient and powerful than having a human being dial phone numbers, and having human beings leave voice mail messages. However, the systems have drawbacks, too.

**Answer:** **NCO denies the allegations of ¶ 16.**

17. Plaintiff is a case-in-point: had a human being been on the line to listen to plaintiff's outgoing voice mail message, NCO would have known that it was calling the wrong telephone number, and would be subject to substantially less liability in this case.

**Answer:** **NCO denies the allegations of ¶ 17.**

18. Instead, NCO had its dialer, which is not capable of interacting with debtors or their voice mail systems, make the calls. As a result of plaintiff's outgoing voice mail message, NCO should have known after the first all that it was calling the wrong person.

**Answer:** **NCO denies the allegations of ¶ 18.**

19. Plaintiff suffered damages as a result of NCO's violations alleged herein.

**Answer:** **NCO denies the allegations of ¶ 19.**

20.     Plaintiff attempted to resolve this action pre-suit and was not able to do so.

**Answer:      NCO admits the allegations of ¶ 20.**

## COUNT I - TCPA

21.     Plaintiff incorporates all previous paragraphs.

**Answer:      NCO re-alleges and re-avers its Answer to ¶¶ 1-20.**

22.     The Telephone Consumer Protection Act, 47 U.S.C. 227 restricts the making of telephone calls to cellular phones for commercial purposes that are made using "any automatic telephone dialing system or an artificial or prerecorded voice." TCPA, § 227 (b)(A)(iii).

**Answer:      Paragraph 22 contains no allegations directed at NCO and is a conclusion of law to which no answer is otherwise required.  To the extent any allegations are stated against NCO, to the extent that plaintiff's allegations derogate from the language of the statute, and to the extent an answer is required, NCO denies the allegations of ¶ 22.**

23.     Defendant made multiple telephone calls to plaintiff's cell phone using an automatic telephone dialing service and/or an artificial or prerecorded voice, as proscribed by the TCPA.  *Watson v. NCO Group, Inc.*, 462 F. Supp. 2d 641-647 (E.D. Pa. 2006).

**Answer:      NCO denies the allegations of ¶ 23.**

24.     Defendant's violations were negligent.   Alternatively and additionally, defendant's violations were willful.

**Answer:      NCO denies the allegations of ¶ 24.**

25.     Plaintiff is entitled to have her right, status and legal relations under the TCPA relating to NCO's calling of her cell phone using an automatic dialing system and/or artificial or prerecorded voice message adjudicated.

**Answer:      NCO denies the allegations of ¶ 25.**

## COUNT II -- FDCPA

26.     Plaintiff incorporates all previous paragraphs of this complaint.

**Answer:      NCO re-alleges and re-avers its Answer to ¶¶ 1-25.**

27.      Repeatedly calling a non-debtor using an automatic telephone dialing system and prerecorded voice message violates the FDCPA, including 15 U.S.C. §§ 1692c(a); 1692d; 1692d(5); 1692e; 1692e(10); and 1692f.

**Answer:      NCO denies the allegations of ¶ 27.**

## COUNT III – Invasion of Privacy

28.     Plaintiff incorporates all previous paragraphs of this complaint.

**Answer:      NCO re-alleges and re-avers its Answer to ¶¶ 1-27.**

29.     NCO's calls to plaintiff were an intentional and unreasonable intrusion upon plaintiff's seclusion.  The number and persistence of these calls, along with NCO's failure to recognize that it was calling the wrong person even though plaintiff's voice mail stated plaintiff's name, shocks the conscience.

**Answer:      NCO denies the allegations of ¶ 29.**

30.     Defendant also otherwise invaded plaintiff's privacy.

**Answer:      NCO denies the allegations of ¶ 30.**

31.     Plaintiff has suffered damages as a result of this invasion of privacy.

**Answer:** **NCO denies the allegations of ¶ 31.**

AND NOW, in further Answer to the Complaint, Defendant NCO avers as follows:

## FIRST AFFIRMATIVE DEFENSE

One or more of the Counts contained in the Complaint fail to state a claim against NCO upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

1.      Pursuant to 15 U.S.C. § 1692k(c), to the extent that a violation is established and in the event NCO is found to be a debt collector as defined in the FDCPA, which is specifically denied, any such violations was not intentional and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

2.      NCO monitors relevant legal decisions affecting the collection industry. NCO has concluded, through its practices and procedures, that the FDCPA does not restrict or prohibit telephone calls to cellular telephones or otherwise require it to obtain consent from the consumer before contacting a consumer on his cellular telephone. *See Ostrander v. Accelerated Receivables,* 2009 WL 909646 (W.D. N.Y. March 31, 2009) (the FDCPA does not prohibit the calling of a cellular telephone when the number was provided by another company and plaintiff gave no indication that he did not wish to be contacted on the cellular number provided).

3.      Alternatively, if the FDCPA does regulate the placing of telephone calls to cellular telephone numbers, NCO reasonably concluded that it had express consent to make such calls.

4.      NCO obtained the number being called, alleged to be plaintiff's cellular telephone number, from the original creditor when the account was placed with NCO.

5.      Plaintiff did not inform NCO that he did not wish to be contacted on the telephone number provided.

6.      To the extent that plaintiff did not provide consent to the calls to the cellular telephone, any violation of the FDCPA was the result of a bona fide error.

## THIRD AFFIRMATIVE DEFENSE

One or more of the counts in the Complaint are barred by the applicable statute of limitations.

## FOURTH AFFIRMATIVE DEFENSE

Though denying that plaintiff has sustained any damages, to the extent plaintiff can establish that she has sustained any damages, plaintiff has failed to mitigate those damages by either answering one of NCO's calls, or by returning NCO's calls to advise NCO that they were allegedly calling the wrong party.

WHEREFORE, Defendant NCO respectfully requests that this answer be deemed good and sufficient, plaintiff's lawsuit be dismissed, with prejudice, at plaintiff's costs, pursuant to Federal and State law, plaintiff be ordered to pay

reasonable attorney's fees and costs for NCO, and for all other general and equitable relief.

Respectfully submitted,

/s/ James K. Schultz
Attorney for Defendant NCO

James K. Schultz
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
E-Mail:  jschultz@ sessions-law.biz

Attorney for Defendant NCO Financial Systems, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 22nd day of June, 2010, a copy of the foregoing Answer and Amended Affirmative Defenses was filed electronically in the ECF system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system, including plaintiff's counsel as described below. Parties may access this filing through the Court's system.

>Alexander H. Burke
>BURKE LAW OFFICES, LLC
>155 N. Michigan Ave., Suite 732
>Chicago, IL 60601
>(312) 729-5288
>(312) 729-5289 (fax)
>ABurke@BurkeLawLLC.com

>/s/ James K. Schultz
>Attorney for Defendant NCO

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEY WALLS, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Zagel |
| | ) | |
| -vs- | ) | CASE NO.   10-CV-2542 |
| | ) | |
| NCO FINANCIAL SYSTEMS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSES TO NCO'S FIRST DISCOVERY REQUESTS

**1.**      **Admit that you have cellular phone service for the number 314-███ 0113.**

Response:  Admit.

**2.**      **Admit that you do not pay for the cellular service you receive at 314-███ 0113.**

Response:  Deny.

**3.**      **Admit that any messages that were left at 314-███ 0113 by NCO were left for Jessica Derossett.**

Response:  Deny.  Plaintiff does not recall ever having heard the name Jessica Derossett until responding to these requests.

**4.**      **Admit that you first received a message on the 314-███ 0113 number on or about September 12, 2007.**

Response:  Deny.  Plaintiff did not get this telephone until approximately November 2008.

**5.**      **Admit that the message you received on September 12, 2007 from NCO at 314-███ 0113 identified the intended recipient of the calla s Jessica Derossett.**

Response:  Deny.  Plaintiff did not get this telephone until approximately November 2008.

**6.**      **Admit that you never returned the call form NCO in response to the message of September 12, 2007 to advise NCO that they had not reached Jessica Derossett.**

Response:  Admit, because plaintiff did not have this phone on September 2007.

**7.      Admit that after September 12, 2007, you received additional messages from NCO at 314-█████0113.**

Response:  Admit.

**8.      Admit that none of the messages left by NCO since September 12, 2007 at 314-██ 0113 were for Ashley Walls.**

Response:  Deny.  All messages plaintiff recalls, including the ones that she has preserved, appear to be directed at plaintiff.

**9.      Admit that none of the messages left by NCO since September 12, 2007 at 314-██ 0113 stated they were for Ashley Walls.**

Response:  Admit.  But none of these messages stated that they were for Jessica Derossett, or anyone else, either, and they were left on plaintiff's voice mail.

**10.     Admit that all of the messages left by NCO since September 12, 2007 at 314-███ 0113 stated they were for Jessica Derossett.**

Response:  Deny.

**11.     Admit that at least one of the messages left by NCO since September 12, 2007 at 314-███ 0113 stated they were for Jessica Derossett.**

Response:  Deny.  None of the messages NCO left on the voice mail while plaintiff had the phone mentioned Jessica Derossett.

**12.     Admit that at least five of the messages left by NCO since September 12, 2007 at 314-███ 0113 stated they were for Jessica Derossett.**

Response:  Deny.  None of the messages NCO left on the voice mail while plaintiff had the phone mentioned Jessica Derossett.

**13.     Admit that at least ten of the messages left by NCO since September 12, 2007 at 314-███ 0113 stated they were for Jessica Derossett.**

Response:  Deny.  None of the messages NCO left on the voice mail while plaintiff had the phone mentioned Jessica Derossett.

**14.     Admit that you never returned a call from NCO in response to a message left at 314-███ 0113.**

Response: Deny. Plaintiff recalls calling NCO in the past few years because she heard from
NCO in phone calls and letters, but does not believe she gave NCO the account number
stated in the voice mails that are the subject of this case. Although the account
numbers on letters plaintiff received and in the voice mail messages plaintiff received
may have been different (plaintiff does not know), plaintiff believed that the phone
messages were in reference to a different alleged debt.

**15.** **Admit that you never called NCO since September 12, 2007 to advise NCO that the
number being called at 314-██0113 was not associated with Jessica Derossett.**

Response: Admit.

**16.** **Admit that you never called NCO since September 12, 2007 to advise NCO that the
number being called at 314-██0113 was not associated with Jessica Derossett.**

Response: Admit.

**17.** **Admit that you never received a call from NCO since September 12, 2007 at 314-██
0113 since informing NCO that they were calling the wrong party.**

Response: Denied, because plaintiff never believed she was the wrong person and did not
inform NCO that she was the wrong person.

**18.** **Admit that you never received a call from NCO since September 12, 2007 at 314-██
0113 since requesting NCO to stop calling you at that number.**

Response: Denied, because plaintiff never believed she was the wrong person and did not
inform NCO that she was the wrong person.

<div align="center">

**IV. INTERROGATORIES**

</div>

**1.** **Identify each and every person who provided any information in connection with
answers to these Requests for Admission, Interrogatories and Requests for Production
of Documents served contemporaneously with these Interrogatories.**

Response: Ashley Walls and her attorney.

**2.** **Identify Ashley Walls.**

Response: Ashley Sydney Cornelia Walls, 1413 W. Farwell, Ap. 2C, Chicago, IL 60626
314-██0113.

**3.** **Identify Jessica Derossett.**

Response: Unknown.

4.      **Identify the name of the person that pays the bill for phone service at 314-███0113.**

Response: Plaintiff's stepfather William Patrick pays the phone company directly, and plaintiff pays Mr. Patrick.

5.      **State when you first obtained cellular phone service for 314-███0113, whether and when this number was ported by you or at your request from a landline, and the names and addresses of all authorized users of the phone that receives service at 314-███0113.**

Response: November 2008. William Patrick, Darlene Patrick and Davin Green. As far as plaintiff knows, the number was not ported.

6.      **Describe the nature of your relationship, if any, with Jessica Derossett, including whether you are related to her, by either blood or marriage, know Jessica Derossett, and for how long you have known Jessica Derossett.**

Response: No relationship.

7.      **Describe each communication that you had with NCO, including the date, time, and substance of each communication.**

Response: Calls and voice mails, as evinced in NCO's account notes. The calls to plaintiff began in November, 2008 as listed below. Plaintiff also recalls getting letters from NCO, and calling NCO sometime in the past few years, but does not recall exactly when.

Plaintiff believes that there were approximately fifty calls, but is still investigating to determine a more precise number.

8.      **Identify every person who has knowledge regarding the claims contained in the Complaint and provide a brief description of the substance of his/her knowledge.**

Response: Plaintiff and NCO.

9.      **Identify each and every witness to any communication that you had with NCO, giving the date and time of each communication.**

Response: Plaintiff and NCO, to the extent that NCO had a person on the line who is competent to testify as to the substance of communications, which plaintiff doubts.

10.  **Identify any documents, taped recordings of conversations or recordings of messages that reflect communications or attempted communications between you and NCO. Please see attached.**

Response:  Please see attached audio files.

11.  **Describe your educational background and history, including whether or not you graduated from high school, attended any vocational-technical or trade schools, attended any college or university, including graduate education, and whether you graduated from any college or university and if so your degree and major.**

Response:  Plaintiff graduated from high school in 2002.  BA in fine arts from Univeristy of Illinois Urbana-Champaign 2006.  Plaintiff has completed all coursework for her masters in arts management at Columbia College in Chicago and her thesis has been accepted, and is waiting for paperwork before she hopefully receives her masters.

12.  **Identify by name, address and telephone number your current and past employers since either gradating or terminating your education, including dates of employment, position or job title and salary and reason for separation.**

Response:  Objection.  Plaintiff's work history is not at all relevant to this case, and  such information is not reasonably calculated to lead to admissible evidence.

13.  **Identify all other lawsuits and court proceedings in which you are or were a party, including for each suit the case number, the name of the Court, the style of the case, and the subject matter of the case.**

None.

14.  **Identify any other collection accounts not described in the Complaint for which you have been contacted by a collection agency or creditor for the past 7 years.**

Response:  Plaintiff objects because most other collection accounts have nothing to do with this lawsuit, and because the seven year scope is overly broad.  Plaintiff has had other accounts that were being collected by NCO over the past few years, but does not remember what those accounts are, and no longer has documentation regarding those accounts.

15.  **Describe any criminal record that you have, including whether you have ever been convicted of a crime or have pleaded guilty or *nolo contendere* to a crime, and if so, the date of each conviction or plea, the name of the court, the crime involved, and the prison or jail, if any, where incarcerated.**

None.

16.     **Identify any notice, whether oral or written, that you provided to NCO in which you disputed the debt at issue in this lawsuit.**

Response:  Plaintiff notified NCO in her outgoing voice mail message that she was not Jessica Dorsett.  Plaintiff's cell phone greeting states that the caller has reached "Ashley Walls."

17.     **Identify all experts you may use at trial, specifying the name and address of the expert and the expert's expected testimony.**

Response:  Plaintiff objects to this request because it is premature.  Plaintiff reserves the right to designate experts pursuant to any schedule entered by the court.  Plaintiff has not yet hired an expert.

18.     **Describe the factual basis and amounts of all damages you sustained as a result of NCO's conduct.**

Response:  Plaintiff seeks statutory damages, only, arising out of the impermissible use of an automatic telephone dialing system and prerecorded or artificial voice message in calls to her cell phone.

19.     **Identify all documents that support your actual damages that you sustained as a result of NCO's conduct.**

Response:  Plaintiff seeks no actual damages in this case.

20.     **Identify any calendars, diaries, logs, notes, journals, or any other written or recorded summary of events maintained by you that in any way relate to this lawsuit.**

Response:  None.

21.     **Please describe all efforts that you undertook to have NCO cease calling you since September 12, 2007 at 314-███0113, including the dates of any communication that you had with NCO, the form of the communication (telephone call; letter; fax; e-mail; etc.), the name of the person to whom you spoke, if any.**

Response:  Plaintiff identified herself by name in her voice mail greeting.  Plaintiff also called NCO to discuss the debt she believed they were attempting to collect.

22.     **Please state whether NCO ever called you at 314-███0113 after you advised them that they were calling a wrong number or requested the calls to stop.**

Response:  Plaintiff notified NCO that the number they were calling belonged to plaintiff every single time NCO called, in plaintiff's voice mail greeting.

## V. REQUESTS FOR PRODUCTION OF DOCUMENTS

**1. Produce all documents that support the factual basis and amounts of all damages you claim you have suffered, including but not limited to statutory damages, actual damages, and mental or emotional damages.**

Plaintiff objects because documents that are protected by the attorney client privilege and the work product doctrine are responsive to this request.  As counsel understands defendant does not intend to ask for such documents, none will be produced and no privilege log will be produced at this time.

Plaintiff does not seek actual damages.  Further answering, please see attached, along with defendant's records.

**2. Produce all documents identified in your responses to the Interrogatories.**

Please see attached, along with materials produced by NCO.

**3. Produce all documents you referred to or relied on in preparing your interrogatory responses.**

Please see attached, along with materials produced by NCO.

**4. Produce all documents that support your factual allegations in the Complaint.**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff.  Further answering, please see attached.

**5. Produce all documents supporting the allegations in ¶ 8 of your Complaint that "Defendant has made more than 35 telephone calls to plaintiff's cellular telephone. Upon information and belief, NCO attempted at least thirty-eight such calls.  The telephone plan is in plaintiff's stepfather's name, and is part of a multi-line "family plan."  Plaintiff carried the phone at all relevant times herein, and was the person subjected to the defendant's violations."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff.  Please see attached, along with materials produced by NCO.

**6. Produce all documents supporting the allegations in ¶ 9 of your Complaint that "Upon information and belief, NCO used a telephone system whereby no human being dialed plaintiff's telephone number to make the calls.  That system is referred to herein as the "dialer."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff.  Please see attached, along with materials produced by NCO.  Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**7.  Produce all documents supporting the allegations in ¶ 10 of your Complaint that "Some or all of the calls to each plaintiff were made with one of NCO's dialers."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff.  Further answering, please see attached.  Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.
Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff.  Please see attached, along with materials produced by NCO.  Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**8.  Produce all documents supporting the allegations in ¶ 11 of your Complaint that "For some or all of those calls, NCO left or attempted to leave voice mail messages. Plaintiff has preserved recordings of some of those voice mail messages."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff.  Please see attached, along with materials produced by NCO.  Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**9.  Produce all documents supporting the allegations in ¶ 12 of your Complaint that "Upon information and belief, NCO was calling plaintiff's cell phone in attempts to contact one or more persons other than plaintiff."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff.  Please see attached, along with materials produced by NCO.  Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**10.  Produce all documents supporting the allegations in ¶ 13 of your Complaint that "At all relevant times, plaintiff's outgoing voice mail message stated that the caller had reached "Ashley Walls." NCO continued to call, despite this."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff.  Please see attached, along with materials produced by NCO.  Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**11. Produce all documents supporting the allegations in ¶ 14 of your Complaint that "NCO uses its dialers and prerecorded messages in order to increase efficiency."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff. Please see attached, along with materials produced by NCO. Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**12. Produce all documents supporting the allegations in ¶15 of your Complaint that "NCO programmed its dialer to dial plaintiff's phone number, even though it may, or may not, have known specifically who was receiving the calls. In this sense, NCO intended to place the calls that are the subject of this lawsuit. Similarly, NCO intended that its dialer(s) leave voice mail messages on the voice mail of the person using plaintiff's cell phone number. All of the voice mails that NCO's dialer left on plaintiff's voice mail were "automated" in the sense that they had been recorded previously, and NCO's dialer played the recording."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff. Please see attached, along with materials produced by NCO. Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**13. Produce all documents supporting the allegations in ¶ 16 of your Complaint that "The TCPA does not restrict calls to cell phones that are dialed by humans, and where humans are present on the line when the person called (or his voice mail) picks up. In continuing to use its dialers, NCO puts law-abiding debt collection agencies at a competitive disadvantage. These illegal systems are vastly more efficient and powerful than having a human being dial phone numbers, and having human beings leave voice mail messages. However, the systems have drawbacks, too."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff. Please see attached, along with materials produced by NCO. Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**14. Produce all documents supporting the allegations in ¶ 17 of your Complaint that "Plaintiff is a case-in-point: had a human being been on the line to listen to plaintiff's outgoing voice mail message, NCO would have known that it was calling the wrong telephone number, and would be subject to substantially less liability in this case."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff. Please see attached, along

with materials produced by NCO. Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**15. Produce all documents supporting the allegations in ¶ 18 of your Complaint that "Instead, NCO had its dialer, which is not capable of interacting with debtors or their voice mail systems, make the calls. As a result of plaintiff's outgoing voice mail message, NCO should have known after the first all that it was calling the wrong person."**

Plaintiff objects because some responsive documents are in the possession, custody and control of defendant and possibly third parties, and not plaintiff. Please see attached, along with materials produced by NCO. Please also see the deposition of Greg Stevens taken in the Donnelly v. NCO case.

**16. Produce all documents supporting the allegations in ¶ 19 of your Complaint that "Plaintiff suffered damages as a result of NCO's violations alleged herein."**

Pease see attached. Plaintiff does not seek actual damages.

**17. Produce all documents supporting the allegations in ¶ 20 of your Complaint that "Plaintiff attempted to resolve this action pre-suit and was not able to do so."**

Plaintiff refers defense counsel James Schultz to email communications between him and the undersigned regarding this case, before it was filed. Plaintiff's counsel's records of these emails will be produced if defendant really wants duplicates.

**18. Produce a copy of the outbound message used for the phone service provided to 314-███0113.**

Please see attached.

**19. Produce a copy of your phone bills for 314-███0113 from January, 2009 through February, 2010.**

Please see attached.

**20. Produce all copies of proof that you made payments for the phone service at 314-███0113 between January, 2009 and February, 2010.**

Please see attached. Investigation continues.

**21. Produce copies of any communications you have sent to NCO since September 12, 2007.**

Plaintiff does not recall ever sending any written communications to NCO.

_____
Alexander H. Burke

**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEY WALLS, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Zagel |
| | ) | |
| -vs- | ) | CASE NO.   10-CV-2542 |
| | ) | |
| NCO FINANCIAL SYSTEMS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

### Verification

Ashley Walls hereby verifies under penalty of perjury that the information in the forgoing

interrogatories is true and complete to the best of her knowledge and belief.

Executed in Chicago, Illinois on October    , 2010

_____

Ashley Walls

12

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEY WALLS, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Zagel |
| | ) | |
| - vs- | ) | Case No.:    10 CV 2542 |
| | ) | |
| NCO FINANCIAL SYSTEMS, INC., | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendant. | ) | |

## NCO FINANCIAL SYSTEMS, INC.'S SUPPLEMENTAL ANSWERS
## TO PLAINTIFF'S FIRST SET OF DISCOVERY

NOW COMES defendant NCO Financial Systems, Inc. ("NCO"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 33, 34 and 36, hereby submits the following responses to Plaintiff's First Discovery Requests.

## REQUESTS FOR ADMISSION

1.     Defendant has called the phone number 314-███0113 numerous times in attempts to collect a debt.

**Response:     Objection; this request is vague and ambiguous because the term "numerous" is not defined.  Subject to and notwithstanding this objection, NCO admits that its records reflect that it called the 314-███0113 number between September 12, 2007 and January 12, 2010 on more than one occasion in an attempt to collect an outstanding bill owed by Jessica Derossett.**

2.     The debt NCO was attempting to collect was not that of Ashley Walls.

**Response:     NCO admits that it was not attempting to collect on an account owed by Ashley Walls when it called the 314-███0113 number.**

3.     NCO called 314-███0113 in attempts to collect a debt with an internal account number of 15435848.

**Response**:     **Admitted.**

4.     NCO account number 15435848 is not that of Ashley Walls.

**Response**:     **NCO admits that the account number 15435848 is not associated with Ashley Walls.**

5.     NCO used its Guaranteed Contacts "GC" dialer to call 314-███0113.

**Response**:     **NCO admits that its records reflect that some of the calls made to 314-███0113 were made through the Guaranteed Contacts "GC" dialer.**

6.     NCO used also used a Soundbite dialer to call 314-███0113.

**Response**:     **NCO admits that its records reflect that some of the calls that were placed to 314-███0113 were made through Soundbite.  NCO denies that it uses a "Soundbite dialer".  Except as specifically admitted, NCO denies the remainder of this request.**

7.     314-███0113 is plaintiff's cellular telephone number.

**Response**:     **After reasonable inquiry, the information known or readily available to NCO is insufficient for it to either admit or deny this request.  Upon information and belief, the 314-███0113 is the home telephone number for Jessica Derossett.  The number was provided by the creditor, St. Joseph Health Center as the home phone number for Jessica Derossett.  Whether the number belongs to plaintiff is information likely in the possession of plaintiff.**

8.     NCO made more than 200 million calls using its Dialers during 2009.

**Response**: **Objection. The term "dialer", as defined by plaintiff, includes equipment used by Soundbite. Soundbite is a vendor retained by NCO. NCO does not make calls using a "Soundbite Dialer". This request is also not relevant or reasonably tailored to lead to the discovery of admissible information. Subject to and without waiving this objection, NCO admits upon information and belief that it likely has made more than 200 million calls using its various dialers in 2009, including but not limited to those dialers defined in plaintiff's discovery requests.**

9. When NCO's GC dialer called 314-████0113, the dialer, rather than a human being, dialed.

**Response**: **NCO is without sufficient information to either admit or deny this request. The GC dialer can be operated in different modes. In certain modes, the dialer is responsible for dialing the number to be called. In other modes, a collector is responsible for causing the number to be dialed. NCO is investigating whether the calls made to 314-████0113 were made with either the dialer or collector dialing the number.**

10. When the Soundbite dialer called 314-████0113, the dialer, rather than a human being, dialed.

**Response**: **After reasonable inquiry, NCO is without sufficient information to either admit or deny this request. Soundbite is a vendor retained by NCO; NCO does not make calls using a "Soundbite Dialer". The manner in which the numbers are dialed by Soundbite is likely within the care or custody of Soundbite.**

11. The GC dialer left prerecorded voice mail messages at 314-████0113.

**Response**: **Denied.**

12. The Soundbite dialer left prerecorded voice mail messages at 314-█ 0113.

**Response**: **After reasonable inquiry, NCO is without sufficient information to either admit or deny this request. Soundbite is a vendor retained by NCO ; NCO does not leave messages using a "Soundbite Dialer". NCO denies this request upon information and belief.**

13. NCO has no documentary evidence that plaintiff provided prior express consent to receive calls on her cell phone, 314-█ 0113, from NCO.

**Response**: **Objection. This request assumes that the calls to 314-█ 0113 were being placed to plaintiff. The 314-█ 0113 was provided by NCO's client as a home phone number for Jessica Derossett. Subject to and without waiving this objection, NCO does not contend that plaintiff provided prior express consent for the calls.**

14. NCO has no documentary evidence that plaintiff provided prior express consent to receive calls placed by an automatic telephone dialing system on her cell phone, 314-█ 0113, from NCO.

**Response**: **Objection. This request assumes that the calls to 314-█ 0113 were being placed to plaintiff. The 314-█ 0113 was provided by NCO's client as a home phone number for Jessica Derossett. Subject to and without waiving this objection, NCO does not contend that plaintiff provided prior express consent for calls using an automatic telephone dialing system.**

15.    NCO has no documentary evidence that plaintiff provided prior express consent to receive calls using an automatic or prerecorded voice message on her cell phone, 314-███0113, from NCO.

**Response:    Objection.  This request assumes that the calls to 314-███0113 were being placed to plaintiff.  The 314-███0113 was provided by NCO's client as a home phone number for Jessica Derossett.  Subject to and without waiving this objection, NCO does not contend that plaintiff provided prior express consent for receiving automatic or prerecorded voice messages.**

16.    NCO has no documentary evidence that plaintiff provided prior express consent to receive calls placed by an automatic telephone dialing system on her cell phone, 314-███0113, with respect to its account number 15435848.

**Response:    Objection.  This request assumes that the calls to 314-███0113 were being placed to plaintiff.  The 314-███0113 was provided by NCO's client as a home phone number for Jessica Derossett.  Subject to and without waiving this objection, NCO does not contend that plaintiff provided prior express consent for calls using an automatic telephone dialing system related to account number 15435848.**

17.    NCO has no documentary evidence that plaintiff provided prior express consent to receive calls using an automatic or prerecorded voice message on her cell phone, 314-███0113, from any other creditor with respect to its account number 15435848.

**Response**: **Objection. This request assumes that the calls to 314-███0113 were being placed to plaintiff. The 314-███0113 was provided by NCO's client as a home phone number for Jessica Derossett. Subject to and without waiving this objection, NCO does not contend that plaintiff provided prior express consent for automatic or prerecorded voice messages.**

18.     Admit that, on the following dates and times, NCO called 314-███0113, using its GC Dialer to (a) dial the digits, and (b) leave a prerecorded voice mail message (please respond for each of the dates as if it was a separate request for admission):

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3/11/09 | 4:13 | | 7/13/09 | 2:47 | | 9/24/09 | 8:48 |
| 3/20/09 | 4:06 | | 7/17/09 | 3:44 | | 10/1/09 | 2:47 |
| 4/2/09 | 3:49 | | 7/29/09 | 9:25 | | 10/6/09 | 9:25 |
| 4/17/09 | 11:11 | | 8/3/09 | 10:53 | | 10/12/09 | 11:39 |
| 4/23/09 | 4:33 | | 8/6/09 | 10:55 | | 10/15/09 | 8:41 |
| 4/27/09 | 1:35 | | 8/10/09 | 4:39 | | 10/20/09 | 4:26 |
| 5/27/09 | 11:56 | | 8/13/09 | 10:55 | | 10/30/09 | 8:40 |
| 5/30/09 | 11:36 | | 8/17/09 | 11:37 | | 11/9/09 | 11:54 |
| 6/2/09 | 11:25 | | 8/20/09 | 10:48 | | 11/12/09 | 1:58 |
| 6/8/09 | 11:48 | | 8/25/09 | 8:21 | | 11/30/09 | 2:10 |
| 6/22/09 | 10:34 | | 8/31/09 | 6:47 | | 12/7/09 | 1:47 |
| 6/26/09 | 3:43 | | 9/9/09 | 5:22 | | 12/14/09 | 5:59 |
| 6/30/09 | 4:20 | | 9/17/09 | 1:43 | | | |

**Response**: **Objection.   NCO is without sufficient information to either admit or deny a portion of this request. The GC dialer can be operated in different**

**modes. In certain modes, the dialer is responsible for dialing the number to be called. In other modes, a collector is responsible for causing the number to be dialed. NCO is investigating whether the calls made to 314-■■■0113 were made with either the dialer or collector dialing the number. Subject to and without waiving this objection, NCO admits that its records reflect that calls were placed to 314-■■■0113 and that messages were left at the dates and times alleged. NCO denies that prerecorded voice messages were left on any call.**

19. On the following dates and times, defendant attempted to call 314-■■■ 0113, using its GC Dialer to dial the digits (please respond for each of the dates as if it was a separate request for admission):

| | |
|---------|-------|
| 7/25/09 | 11:25 |
| 7/28/09 | 9:49 |
| 7/28/09 | 3:49 |
| 8/31/09 | 11:53 |
| 9/17/09 | 10:55 |
| 10/5/09 | 5:46 |
| 10/20/09 | 8:45 |

**Response: Objection. NCO is without sufficient information to either admit or deny a portion of this request. The GC dialer can be operated in different modes. In certain modes, the dialer is responsible for dialing the number to be called. In other modes, a collector is responsible for causing the number to be dialed. NCO is investigating whether the calls made to 314-■■■0113 were made**

**with either the dialer or collector dialing the number. Subject to and without waiving this objection, NCO admits that its records reflect that calls were placed to 314-███ 0113 at the dates and times alleged.**

20. On the following dates, defendant called 314-███ 0113, using its Soundbite Dialer to (a) dial the digits, and (b) leave a prerecorded voice mail message (please respond for each of the dates as if it was a separate request for admission):

| | | | | |
|---|---|---|---|---|
| 3/24/09 | Entered 3:14 3/24 | | 10/3/09 | Entered 6:14 12/3 |
| 4/7/09 | Entered 4:35 4/7 | | 12/18/09 | Entered 7:10 12/18 |
| 4/30/09 | Entered 3:06 4/30 | | 12/28/09 | Entered 8:36 12/29 |
| 5/4/09 | Entered 3:09 5/4 | | 12/31/09 | Entered 6:12 12/31 |
| 6/11/09 | Entered 1:09 6/11 | | 1/5/10 | Entered 7:15 1/5/10 |
| 6/15/09 | Entered 2:23 6/15 | | 1/8/10 | Entered 5:11 1/8/10 |
| 7/06/09 | Entered 1:54 7/6 | | 1/12/10 | Entered 7:17 1/12/10 |
| 7/9/09 | Entered 2:30 7/9 | | 1/15/10 | Entered 3:05 1/15/10 |
| 7/22/09 | Entered 3:07 7/22 | | 1/18/10 | Entered 8:28 1/19/10 |
| 9/3/09 | Entered 6:21 9/3 | | | |
| 9/14/09 | Entered 8:12 9/15 | | | |
| 9/21/09 | Entered 8:23 9/22 | | | |
| 9/28/09 | Entered 8:19 9/29 | | | |
| 10/23/09 | Entered 5:10 10/23 | | | |
| 10/27/09 | Entered 6:18 10/27 | | | |
| 11/3/09 | Entered 8:33 11/04 | | | |
| 11/23/09 | Entered 8:20 11/4 | | | |

**Response**: NCO denies this request to the extent plaintiff alleges that it made calls through "its Soundbite dialer". Soundbite is a vendor retained by NCO. NCO does not make calls using a "Soundbite Dialer". NCO admits that its records reflect that Soundbite called the 314-█████0113 number on the dates and times alleged, except for the call allegedly made on "10/3/09". The "10/3/09" call was made, according to NCO's records, actually on "12/3/09". NCO is without sufficient information to either admit or deny that part of the request related to how the digits were dialed as this information is within the custody of Soundbite. NCO denies, upon information and belief, that prerecorded voice mail messages were left during any of the calls.

21. The "entered" time listed for each of the above represents NCO's record of when its recordkeeping systems recorded the calls made by the Soundbite Dialer.

**Response**: Objection. This request is confusing, ambiguous and based on an incorrect statement of facts. Soundbite is a vendor retained by NCO. NCO does not make calls using a "Soundbite Dialer". Subject to and without waiving this objection, the "entered" time reflects the time that Soundbite updated the account information into NCO's system.

22. Exhibit A contains a true and accurate copy of NCO's records of collection activity as to account number 15435848.

**Response**: Admitted.

23.    Exhibit A contains a true and accurate copy of NCO's records of calls it made to 314-███0113.

**Response:    Admitted upon information and belief.**

24.    The parties in this action have agreed that the deposition testimony of Greg Stevens given in the Donnelly v. NCO, 09-cv-2264, is admissible in this case.

**Response:    Objection. This request is outside the scope of Federal Rule of Civil Procedure 36.**

25.    The parties in this action have agreed that Greg Stevens would testify identically in this case if asked the questions posed in his deposition in Donnelly v. NCO, 09-cv-2264.

**Response:    Objection. This request is outside the scope of Federal Rule of Civil Procedure 36.**

26.    NCO has no documentary evidence that plaintiff provided prior express consent to receive calls placed by an automatic telephone dialing system on her cell phone, 314-███0113, with respect to its account number 15435848.

**Response:    See NCO's response to Request No. 16.**

27.    NCO has no documentary evidence that plaintiff provided prior express consent to receive calls using an automatic or prerecorded voice message on her cell phone, 314-███0113, from any other creditor with respect to its account number 15435848.

**Response:    See NCO's response to Request No. 17.**

28.     The outgoing voice mail message on 314-███0113 stated during 2009 and 2010, that the caller had reached "Ashley Walls."

**Response:     After reasonable inquiry, NCO is without sufficient information to either admit or deny a portion of this request.  This information is likely in the possession of plaintiff.**

29.     NCO never attempted to listen to the outgoing voice mail message on 314-███0113.

**Response:     Denied.**


## INTERROGATORIES

1.     Identify all calls you or your Dialer made with telephone number 314-███0113.  Include the method of contact (e.g. Dialer or manual dial), where the dialer was physically located, what kind of dialer was used, whether an automated or "live" voice message was left, the date and time of each call and the text of the message that was left, if any.

**Answer:     See the account notes previously produced and attached to plaintiff's discovery requests as Exhibit A, which reflect all calls that were made to 314-███0113, whether the calls were made through the dialer or manual calls, the type of dialer, the date and time of each call, and whether a message was left.**

The calls were made through either NCO's Guaranteed Contacts dialer, through Soundbite, a vendor hired by NCO to place calls or manually by NCO's collectors.

The calls from NCO's Guaranteed Contacts dialer originated from Springfield, Missouri.

NCO is without sufficient knowledge or information to state the location from which the Soundbite calls originated.

Manual calls were also made from NCO's office in Springfield, Missouri.

A copy of the message left through the Guaranteed Contacts dialer is being produced contemporaneously with these responses.  NCO is attempting to obtain a copy of the message left by Soundbite, and will supplement this response.   Upon information and belief, any manual message left would have followed the company approved script.  However, this information is not relevant or reasonably tailored to lead to the discovery of admissible information as this case involves only pre-recorded or artificial voice messages, and NCO therefore objects to producing a copy of the manual message script.  NOC further objects to producing the manual message script as it contains confidential and sensitive proprietary business information.

<u>Supplemental Answer:</u>    Calls were made from NCO's "GC" dialer, located in Springfield, Missouri on the following dates and times:

| Call Date | Call Time | Source of Call | Message (recorded or manual) |
|-----------|-----------|----------------|------------------------------|

| | | | |
|---|---|---|---|
| 3/11/09 | 4:14 p.m. | GC | Manual message |
| 3/20/09 | 4:06 p.m. | GC | Recorded message |
| 4/2/09 | 3:49 p.m. | GC | Recorded message |
| 4/17/09 | 11:11 a.m. | GC | Recorded message |
| 4/23/09 | 4:33 p.m. | GC | Recorded message |
| 4/27/09 | 1:35 p.m. | GC | Recorded message |
| 5/27/09 | 11:56 a.m. | GC | Manual message |
| 5/30/09 | 11:36 a.m. | GC | Recorded message |
| 6/2/09 | 11:25 a.m. | GC | Manual message |
| 6/8/09 | 11:48 a.m. | GC | Recorded message |
| 6/22/09 | 10:34 a.m. | GC | Recorded message |
| 6/26/09 | 3:43 p.m. | GC | Manual message |
| 6/30/09 | 4:20 p.m. | GC | Recorded message |
| 7/13/09 | 2:47 p.m. | GC | Recorded message |
| 7/17/09 | 3:44 p.m. | GC | Recorded message |
| 7/25/09 | 11:25 a.m. | GC | No message |
| 7/28/09 | 9:49 a.m. | GC | No message |
| 7/28/09 | 3:49 p.m. | GC | No message |
| 7/29/09 | 9:25 a.m. | GC | Recorded message |
| 8/3/09 | 10:53 a.m. | GC | Recorded message |
| 8/6/09 | 10:55 a.m. | GC | Recorded message |

| 8/10/09 | 4:39 p.m. | GC | Recorded message |
|---------|-----------|----|-----------------| 
| 8/13/09 | 10:55 a.m. | GC | Recorded message |
| 8/17/09 | 11:37 a.m. | GC | Recorded message |
| 8/20/09 | 10:48 a.m. | GC | Recorded message |
| 8/25/09 | 8:21 a.m. | GC | Recorded message |
| 8/28/09 | 8:35 a.m. | GC | Recorded message |
| 8/31/09 | 11:53 a.m. | GC | Unknown |
| 8/31/09 | 6:47 p.m. | GC | Recorded message |
| 9/9/09 | 5:22 p.m. | GC | Recorded message |
| 9/17/09 | 10:55 a.m. | GC | No message |
| 9/17/09 | 1:43 p.m. | GC | Recorded message |
| 9/24/09 | 8:48 a.m. | GC | Recorded message |
| 10/1/09 | 2:47 p.m. | GC | Manual message |
| 10/5/09 | 5:46 p.m. | GC | No message |
| 10/6/09 | 9:25 a.m. | GC | Recorded message |
| 10/12/09 | 11:39 a.m. | GC | Recorded message |
| 10/15/09 | 8:41 a.m. | GC | Recorded message |
| 10/20/09 | 8:45 a.m. | GC | No message |
| 10/20/09 | 4:26 p.m. | GC | Recorded message |
| 10/30/09 | 8:40 a.m. | GC | Recorded message |
| 11/9/09 | 11:54 a.m. | GC | Recorded message |

| | | | |
|---|---|---|---|
| **11/12/09** | **1:58 p.m.** | **GC** | **Recorded message** |
| **11/30/09** | **2:10 p.m.** | **GC** | **Recorded message** |
| **12/7/09** | **1:47 p.m.** | **GC** | **Manual message** |
| **12/14/09** | **5:59 p.m.** | **GC** | **Recorded message** |

**According to NCO's records, calls were made from Soundbite (SB), based in**

**Bedford, Massachusetts, on the following dates and times:**

| **Call Date** | **Call Time** | **Source of Call** | **Message (recorded or manual)** |
|---|---|---|---|
| **9/12/07** | **1:08 p.m.** | **SB** | **Recorded message** |
| **3/24/09** | **3:14 p.m.** | **SB** | **Recorded message** |
| **4/7/09** | **4:35 p.m.** | **SB** | **Recorded message** |
| **4/30/09** | **3:06 p.m.** | **SB** | **Recorded message** |
| **5/4/09** | **3:09 p.m.** | **SB** | **Recorded message** |
| **6/11/09** | **1:09 p.m.** | **SB** | **Recorded message** |
| **6/15/09** | **2:23 p.m.** | **SB** | **Recorded message** |
| **7/6/09** | **1:54 p.m.** | **SB** | **Recorded message** |
| **7/9/09** | **2:30 p.m.** | **SB** | **Recorded message** |
| **7/22/09** | **3:07 p.m.** | **SB** | **Recorded message** |
| **9/3/09** | **6:21 p.m.** | **SB** | **Recorded message** |
| **9/14/09** | **8:12 a.m.** | **SB** | **Recorded message** |
| **9/21/09** | **8:23 a.m.** | **SB** | **Recorded message** |

| 9/28/09 | 2:25 p.m. | SB | Recorded message |
|---------|-----------|----|------------------|
| 10/23/09 | 2:41 p.m. | SB | Recorded message |
| 10/27/09 | 2:52 p.m. | SB | Recorded message |
| 11/3/09 | 2:33 p.m. | SB | Recorded message |
| 11/23/09 | 12:35 p.m. | SB | Recorded message |
| 12/3/09 | 11:55 a.m. | SB | Recorded message |
| 12/18/09 | 4:04 p.m. | SB | Recorded message |
| 12/28/09 | 1:31 p.m. | SB | Recorded message |
| 12/31/09 | 11:11 a.m. | SB | Recorded message |
| 1/5/10 | 12:00 p.m. | SB | Recorded message |
| 1/8/10 | 12:17 p.m. | SB | Recorded message |
| 1/12/10 | 2:51 p.m. | SB | Recorded message |
| 1/15/10 | 10:24 a.m. | SB | Recorded message |
| 1/18/10 | 1:35 p.m. | SB | Recorded message |
| 8/31/09 | 11:53 a.m. | SB | Recorded message |

The specific messages left for plaintiff are no longer available to NCO. The following is the template of the content of the recorded messages that were left. Upon information and belief, the content of the messages left for plaintiff would match this language, except that a specific name of an individual and the call back number would have been included in the message.

| This is an important message from NCO Financial Systems Inc. |
|---|
| The law requires that we notify you that this is a debt collection company. This is an attempt to collect a debt and any information obtained will be used for that purpose, please call us back today at toll free 1 <TTS caller id> |
| When calling us back the reference ID is <TTS of Client ID> |
| Thank you. Good bye |

2.    Identify all persons who took any steps toward collecting any debt that has ever been associated with the telephone number 314-██0113.

**Answer:**    **Objection.    This interrogatory is overly broad, vague, ambiguous and is not relevant or reasonably tailored to lead to the discovery of admissible evidence.    Subject to and without waiving said objection, according to NCO's records, the only person that had a conversation with plaintiff was Beth Doorn.    Ms. Doorn previously worked out of NCO's office in Springfield, Missouri, though she is no longer employed.**

**Upon information and belief, the following individuals placed calls to 314-██0113:**

**Steven L. Miller**

**Teona McGuire**

**Amanda Plants**

**Tonia Carpenter**

**Kathy Pedigo**

**Melissa Joy**

**Pamela A. Nguyen**

**Each of the above employees was employed in NCO's Springfield, Missouri office. Mr. Miller, Ms. Carpenter and Ms. Nguyen are no longer employed with NCO.**

3.      Identify all policies, practices and procedures that are designed to prevent NCO's Dialers from calling or using prerecorded or artificial voice messages for telephone numbers where the outgoing voice mail message for the called number states the name of the recipient, where the name on the outgoing voice mail is different from the name in NCO's records.

**Answer:      Objection. This interrogatory seeks to discover information that is confidential and contains sensitive and proprietary business information. Subject to and without waiving this objection, NCO does not use prerecorded or artificial voice messages as defined by the TCPA. NCO's policies are to cease calling any number, through either the dialer or manually, upon confirming that the number being called is not a proper contact number for the consumer.**

4.      Identify your defenses in this case, and all documents that support or refute such.

**Answer:      Objection. This interrogatory seeks information protected by the attorney client privilege and the work product doctrine. Subject to and without waiving this objection, discovery in this case is just beginning and all of NCO's defenses have not been developed, nor have all documents supporting those defenses been compiled. NCO was provided the number being contacted at a home number**

for Jessica Derossett. NCO called the number reasonably expecting to reach that consumer. Immediately upon being informed that they were not calling a number associated with Ms. Derossett, NCO ceased all calls to that number. NCO also denies that its activities in this case are subject to the TCPA, because the dialer equipment it uses, or is used by Soundbite, is not an "automatic telephone dialing system", and further denies that the messages being left at 314-███0113 were "pre-recorded or artificial voice" messages as defined by the TCPA. See also NCO's affirmative defenses.

Supplemental Answer: NCO anticipates that the following individuals will be called upon to testify regarding the abilities and capacities to store and generate telephone numbers of the dialers that were used to make dialer calls to (314) ███ 0113.

Edgars Sturans
CR Software, LLC
4035 Ridge Top Road, Suite 600
Fairfax, VA 22030
(703) 934-9060

Timothy R. Segall
SoundBite Communications
22 Crosby Drive
Bedford, MA 01730
(781) 897-2509

## DOCUMENT REQUESTS

1. All documents that mention or pertain to the plaintiff, Ashley Walls, or symbol, number or other designation that is associated with Ashley Walls.

**Response:** **See the account notes produced as NCO 0001 – NCO 0014. See also NCO's Response to Request No. 6.**

2.      All documents that mention or pertain to the plaintiff, Jessica Derossett, or symbol, number or other designation that is associated with Jessica Derossett. (We agree to keep these materials confidential.)

**Response:** **See the account notes produced as NCO 0015 – NCO 0036.**

3.      All documents that mention or pertain to the telephone number 314-███0113, or any debtor, symbol, number or other designation that is associated with that number.

**Response:** **See NCO's response to request number 2.**

4.      A copy of the script for any message used during any call to 314-███0113.

**Response:** **Objection. This request is overbroad in that it seeks production of manual messages. Plaintiff's allegations related to messages do not deal with manual messages, and is limited to messages that plaintiff contends were pre-recorded or artificial. Therefore, the script of the manual messages is not relevant, or reasonably tailored to lead to the discovery of admissible information. Subject to and without waiving this objection, NCO is producing a copy of the message being used by the Guaranteed Contacts dialer. NCO is also attempting to obtain a copy of the message that was being left by Soundbite and will supplement this response. Investigation continues.**

5.      A copy of the actual recording for any message used during any call to 314-███0113.

**Response**: Objection. This request is overbroad in that it seeks production of manual messages. Plaintiff's allegations related to messages do not deal with manual messages, and is limited to messages that plaintiff contends were pre-recorded or artificial. Therefore, the script of the manual messages is not relevant, or reasonably tailored to lead to the discovery of admissible information. Subject to and without waiving this objection, NCO is producing a copy of the message being used by the Guaranteed Contacts dialer. NCO is also attempting to obtain a copy of the message that was being left by Soundbite and will supplement this response. Investigation continues.

6.      A copy of all correspondence ever sent to plaintiff by NCO.

**Response**: Objection. This request seeks materials that are not relevant or reasonably tailored to lead to the discovery of admissible evidence. Plaintiff's claims consist of telephone calls made to her cell phone only, and relate in no way to the content of any letters. Subject to and without waiving this objection, produced as NCO 0037 – NCO 0040 are templates of the letters that NCO has sent to Ashley Walls.

7.      A copy of the complaint for any action or proceeding filed against you for violation of the TCPA. Duplicate copies of materials produced in the Donnelly litigation are not necessary.

**Response**: Objection; said request is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible

information.    Objecting further, evidence of other complaints, lawsuits and

proceedings filed against NCO is inadmissible and not likely to lead to the discovery

of admissible evidence under Rule 404 of the Federal Rules of Evidence when

offered to demonstrate that prior complaints, lawsuits and proceedings against

NCO are evidence of the validity of Plaintiff's current claims.    Therefore, any

complaints, lawsuits and proceedings in the past cannot serve to buttress the merits

of Plaintiff's case.


AS TO OBJECTIONS:


/s/ James K. Schultz_____
Attorney for Defendant NCO

David Israel
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.C.
Lakeway Two, Suite 200
3850 North Causeway Boulevard
Metairie, LA 70002-7227
Telephone:  (504) 828-3700
Facsimile:  (504) 828-3737
E-Mail:      disrael@sessions-law.biz


James K. Schultz
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
55 West Monroe Street, Suite 1120
Chicago, IL  60603
Telephone:  (312) 578-0990
Facsimile:  (312)  578-0991
E-Mail:      jschultz@sessions-law.biz

Attorney for Defendant NCO Financial Systems, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a copy of the foregoing

**NCO'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST DISCOVERY**

**REQUESTS**  was served on the following attorney of record via electronic mail on this

the 16th day of December, 2010.

>Alexander H. Burke
>BURKE LAW OFFICES, LLC
>155 N. Michigan Ave., Suite 9020
>Chicago, IL  60601
>ABurke@BurkeLawLLC.com

>/s/ James K. Schultz
>Attorney for Defendant NCO

James K. Schultz
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLP
55 W. Monroe St., Suite 1120
Chicago, Illinois  60603
Telephone:  (312) 578-0990
Facsimile:  (312) 578-0991
E-Mail:      jschultz@sessions-law.biz

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Case No. 1:10-cv-2542

ASHLEY WALLS,

     Plaintiff,

vs.

NCO FINANCIAL SYSTEMS, INC.,

     Defendant.

DEPOSITION OF GREG STEVENS

Taken on Behalf of the Plaintiff

DATE TAKEN:    AUGUST 18, 2011

TIME:          12:26 P.M. - 1:10 P.M.

PLACE:         SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
                 3350 BUSCHWOOD PARK DRIVE, SUITE 195
                 TAMPA, FLORIDA 33618

Examination of the witness taken before:

Susan D. Wasilewski
Registered Professional Reporter
Certified Realtime Reporter
Certified CART Provider
Certified Manager of Reporting Services
Florida Professional Reporter
~ Realtime Systems Administrator ~

**Page 2**

```
 1              APPEARANCES
 2   Counsel for Plaintiff:
 3      ALEXANDER H. BURKE, ESQ.  (Via Mobile Depo)
        Burke Law Offices, LLC
 4      Attorney at Law
        155 North Michigan Avenue, Suite 9020
 5      Chicago, Illinois 60601
        aburke@burkelawllc.com
 6
 7   Counsel for Defendant:
 8      DAYLE M. VAN HOOSE, ESQ.
        Sessions, Fishman, Nathan & Israel, LLC
 9      3350 Buschwood Park Drive, Suite 195
        Tampa, Florida 33618
10      dvanhoose@sessions-law.biz
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1              I N D E X
 2   WITNESS                          PAGE
 3   CALLED BY THE PLAINTIFF:
 4   GREG STEVENS
 5      DIRECT EXAMINATION BY MR. BURKE............... 4
 6   CERTIFICATE OF REPORTER OATH.................... 30
 7   CERTIFICATE OF REPORTER........................ 31
 8   ERRATA SHEET.................................. 32
 9
10
11            E X H I B I T S
12
13                       PAGE
14   No. 1    NCO's Answer and Affirmative Defenses   8
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

 1   THEREUPON, the following proceedings were had

 2   and taken at 12:26 p.m.:

 3      THE COURT REPORTER:  Do you solemnly swear or

 4   affirm the testimony you are about to give will be

 5   the truth, the whole truth, and nothing but the

 6   truth?

 7      THE WITNESS:  Yes.

 8      THE COURT REPORTER:  Thank you.

 9      GREG STEVENS, called as a witness by the

10   Plaintiff, having been first duly sworn, testified as

11   follows:

12         DIRECT EXAMINATION

13   BY MR. BURKE:

14      **Q.  Good afternoon.**

15      A.  Good afternoon.

16      **Q.  Would you state your name, please?**

17      A.  Greg Stevens.

18      **Q.  Mr. Stevens, are you employed?**

19      A.  Yes, I am.

20      **Q.  Where are you employed?**

21      A.  NCO Financial Systems.

22      **Q.  What is NCO Financial Systems?**

23      A.  A collection agency.

24      **Q.  What is your job with NCO Financial Systems?**

**Page 5**

 1      A.  My title is vice president of customer contact

 2   management.

 3      **Q.  What are your job duties as vice president of**

 4   **customer contact management?**

 5      A.  They vary, website oversight, skiptracing

 6   vendors, vendor management, dialer management.

 7      **Q.  When you say dialer management, what do you**

 8   **mean?**

 9      A.  I have a team that reports to me that runs the

10   NCO dialer.

11      **Q.  How many people are in that team that run the**

12   **NCO dialers?**

13      A.  Four.

14      **Q.  Four people.  How many dialers does NCO have?**

15      A.  Approximately 25.

16      **Q.  And I understand there are different kinds of**

17   **dialers; is that correct?**

18      A.  Yes.

19      **Q.  What are the different kinds of dialers that**

20   **NCO uses?**

21      A.  We have FACS Ontario Systems, Guaranteed

22   Contacts Dialer, CRS Mercury Dialer, and Aspect.  We

23   also utilize two companies, SoundBite and LiveVox.

24      **Q.  And when you say FACS, you mean, F-A-C-S,**

1  right?
2      A.  Correct.
3      Q.  Are you familiar with the account that is the
4  subject of this lawsuit?
5      A.  Yes.
6      Q.  Okay.  You're being presented today as a Rule
7  30(b)(6) witness as to five topics, are you aware of
8  that?
9      A.  Yes.
10     Q.  Have you reviewed those topics in the notice of
11 deposition?
12     A.  Yes.
13     Q.  Are you competent to testify as to each of
14 those five topics?
15     A.  I think I am.
16     Q.  Okay.  Great.  Do you know which of the dialers
17 were used to make the phone calls that are the subject
18 of this lawsuit?
19     A.  The GC Dialer, and SoundBite.
20     Q.  With regard to the GC Dialer, can you please
21 tell me what sort of human involvement is used in making
22 phone calls to collect debts using the GC Dialer?
23     A.  The dialer can be run in several ways.  One,
24 where the collector uses the dialer like a telephone.

6

1  They initiate the phone call.  They can dial the digits,
2  punch in the digits to dial, choose a phone number to
3  dial and hit a button and have the dialer make that
4  phone call.  It would basically replace the phone on
5  their desk.
6      Q.  Okay.  And are calls also made as part of
7  campaigns?
8      A.  Correct.
9      Q.  Okay.  Can you explain that process, please?
10     A.  The campaign is set up by a manager or a
11 supervisor.  They scan the accounts that they want to
12 call that day, depending upon various input, balance and
13 so forth.  They bill the queue, the campaign.  At that
14 point they would start the campaign by hitting a button
15 to say start.  They also manage the campaign while it's
16 running for pacing, to stop the campaign, to pause it.
17     Q.  Okay.  And when the campaign is running, what's
18 happening?  Are phone numbers being dialled by the
19 dialer?
20     A.  Yes.
21     Q.  Are -- through the GC Dialer, are messages
22 sometimes left for debtors?
23     A.  Yes.
24     (Plaintiff's Exhibit No. 1 was marked for

7

1  identification.)
2      Q.  In the discovery responses in this case, which
3  are included in the Exhibit 1 that's already been
4  marked -- you're going to have to sift through it for a
5  minute to find the first page of the discovery request,
6  responses.
7      MS. VAN HOOSE:  Page 1 -- go to page 1.  I
8  think he wants to start at the beginning.
9      A.  Oh, page 1.  I'm sorry.  Page 1?
10     Q.  Unfortunately, there are no page numbers on
11 these guys.  I want to direct your attention to the
12 response to interrogatory 1.
13     MS. VAN HOOSE:  That's the answers.  Keep
14 going.
15     Q.  It has a table of calls on it.
16     MS. VAN HOOSE:  Yeah.  Keep going.
17     A.  Does it start with 3-11-09?
18     Q.  Yes.
19     A.  Okay.
20     Q.  Are you familiar with these discovery responses
21 generally?
22     A.  Yes.
23     Q.  Okay.  Would it be accurate to say that these
24 discovery -- this table shows a number of calls that NCO

8

1  made to the 0113 phone number using its GC Dialer?
2      A.  It shows two different types of dialling on the
3  GC; one in the manual mode where the collector initiates
4  the phone call, and then two in the automated mode.
5  Both are logged on here.
6      Q.  You mean manual messages or manual dials?
7      A.  Well, what I explained earlier, when they
8  manually dial using the dialer.  In that case there was
9  also a manual message.
10     Q.  So whenever there's a manual message, it means
11 that there is a manual dial as well?
12     A.  Yes.
13     Q.  Does the manual dial happen through the same
14 phone system as the campaigns are run?
15     A.  I don't understand your question.
16     Q.  Well, there's this dialer system, right, that
17 NCO uses?  It's called the GC dialer, right?
18     A.  Correct.
19     Q.  Okay.  When there are manual calls made, I
20 think you testified that the collector pushes a button
21 and the number is called; is that correct?
22     MS. VAN HOOSE:  Object to form.  Go ahead.
23     THE WITNESS:  I'm sorry?
24     MS. VAN HOOSE:  You can answer.  Go ahead.

9

**Page 10**

1    A.  The selector basically selects a number.  They
2 can input a number to dial by keying in the actual phone
3 number, or they can select a number that is on the
4 account screen to dial.  So if they selected the home
5 phone, they can say I want the home phone dialed.  They
6 select that phone, they hit enter, and then the dialer
7 dials it for them.
8    Q.  Okay.
9    A.  They can also key in the phone number that they
10 want to dial using their key pad and hit enter and the
11 phone number is dialled.
12    Q.  And in both of those instances, would the
13 number be dialled by the GC Dialer?
14    A.  The dialer acts like a phone switch.  It's
15 basically a phone system.  So you're looking at it like
16 a phone switch.  It's just like you picked up your phone
17 that you have at your ear now and used that phone to
18 dial, is how it works in manual mode.
19    Q.  Except it's all going through the GC Dialer,
20 right?
21    MS. VAN HOOSE:  Object to form.
22    A.  I'm not quite sure what you mean going through
23 the dialer.  The dialer, again, is like a phone switch.
24 It has T1 cards in it.  But is the dialer mechanism

**Page 11**

1 making that phone call using its T1 and -- to the phone
2 company?  Then I would say yes.  But, again, it's 100
3 percent manual intervention with the collector making
4 that phone call.
5    Q.  For the phone calls that are listed as a
6 recorded message --
7    A.  Correct.
8    Q.  -- can you explain to me what recorded message
9 means here?
10    A.  It's a message that we predefine on the system
11 that is left for the consumer.
12    Q.  And does that recorded message, does that mean
13 it's recorded like an actor or someone who actually
14 records the message that's later played?
15    A.  What do you mean by actor?
16    Q.  Well, some human being speaks into like a tape
17 recorder or something of that nature to record the
18 message ahead of time and then that message is played
19 later when the phone call is made; is that how it works?
20    A.  Yes.
21    Q.  Okay.  So would it be accurate to say that each
22 of the phone calls that are listed here in these
23 discovery responses that say recorded message in the
24 right hand column, that means that there was a message

**Page 12**

1 that had been recorded ahead of time that was played?
2    MS. VAN HOOSE:  Object to form.
3    A.  Yes.
4    Q.  Okay.  With regard to the SoundBite Dialer, I
5 think you testified earlier that the SoundBite Dialer,
6 also called the 0113 number, isn't that correct?
7    MS. VAN HOOSE:  Object to form.
8    A.  Yes.
9    Q.  And when I refer to the 0113 number, I mean the
10 number that we have identified, that the plaintiff has
11 identified as the phone number of the plaintiff, Ashley
12 Walls.  Okay?
13    A.  Okay.
14    Q.  Reviewing the discovery responses, which I
15 understand -- well, let's back up for a second.
16    Is it your understanding that this table and
17 the supplemental discovery responses to the SoundBite
18 Dialer is correct as to the phone calls that were made?
19    A.  Without going back with every single one of
20 them at this time, I would say yes.
21    Q.  Okay.  Is the SoundBite Dialer ever -- does the
22 SoundBite Dialer have the capacity to do a manual dial
23 like you described as to the GC Dialer?
24    A.  In the context of this account we're talking

**Page 13**

1 about or itself?
2    Q.  How about I'll ask it a different way.
3    Were there any manual dials to the 0113 number
4 on the SoundBite Dialer?
5    A.  Not that I can tell.
6    Q.  Okay.  And it appears that each one of these
7 says that there is a recorded message, right?
8    A.  It does.
9    Q.  Okay.  So I would understand that to mean that
10 there was a message that had been recorded ahead of time
11 that was played during each of these SoundBite calls;
12 would that be correct?
13    MS. VAN HOOSE:  Object to form.
14    A.  Yes.
15    MR. BURKE:  Is there objections or something
16 that are being made?  I can't hear them on the
17 phone.
18    MS. VAN HOOSE:  Oh, okay.  I'm sorry about
19 that.  I'll speak up.
20    MR. BURKE:  What was that last one?
21    MS. VAN HOOSE:  I just object to form.
22    MR. BURKE:  Okay.
23 BY MR. BURKE:
24    Q.  If you turn the page to the end of the response

**Page 14**

1  to interrogatory 1, at the top of the page that has
2  interrogatories 2 on it there's a separate table, I
3  believe it's the script for the voice message that was
4  used. Do you see that?
5     A. Yes.
6     Q. Can you describe to me how that script was
7  played?
8     A. Not -- I don't understand your question.
9     Q. Well, would it be accurate to say that the
10  script that's identified in these responses is the
11  recorded message that was played in each of the phone
12  calls that are identified in the response to this
13  interrogatory?
14     A. For the most part, yes. There are slight
15  differences. On the SoundBite we would play the
16  reference ID. On the GC, the reference ID is not
17  included.
18     Q. Otherwise, it would be the same prerecorded
19  script as to each of these messages that indicate that
20  there was a recorded message; is that right?
21     MS. VAN HOOSE: Object to form.
22     A. If you're asking if that's the message played,
23  yes.
24     Q. Okay. Do you know how many total calls there

**Page 15**

1  were to the 0113 number using the dialer?
2     A. Off the top of my head, no. I thought --
3     THE WITNESS: Did we not --
4     MS. VAN HOOSE: I don't think we gave a number.
5     A. We didn't give a number.
6     Q. Okay. But if you added up all these calls in
7  the table --
8     A. Yes.
9     Q. -- then you would -- ostensibly you would get
10  the total number, is that correct?
11     A. Agreed.
12     MS. VAN HOOSE: Wait. Okay. Alex, you know
13  with the distinction that he testified to about the
14  manual versus the -- you know, the manual dial, but
15  I think he's identified those for you.
16     MR. BURKE: Yeah.
17     MS. VAN HOOSE: Not with the breakdown. I
18  don't think we -- I don't know if that was clear.
19     MR. BURKE: I think on the legal issue we can
20  agree to disagree as to whether those are included.
21     MS. VAN HOOSE: Right. But understand there's
22  the distinction, and he's told you how to identify
23  the distinction.
24     MR. BURKE: Right.

**Page 16**

1  BY MR. BURKE:
2     Q. Does NCO contend that it had Ashley Walls'
3  consent to call the 0113 number using its dialers?
4     A. We were given the account or an account for a
5  different consumer with that phone provided by the
6  client as that consumer's home phone.
7     Q. Does NCO contend that it had Ashley Walls'
8  consent to receive calls using NCO's dialer or recorded
9  messages as to the 0113 number?
10     A. We believe when we were calling on the account,
11  we were calling for a different consumer.
12     Q. I think you stated a minute ago that the
13  original creditor provided the 0113 number to NCO,
14  right?
15     A. Yes.
16     Q. How do you know that?
17     A. We were given information from the creditor.
18     Q. Would that be -- would that information be in
19  the collection notes?
20     A. You can disseminate that from the notes showing
21  when the phone number was removed from the account that
22  it was the original phone.
23     Q. If you go farther into the production or the
24  exhibit, there will start to be Bates numbers. If you

**Page 17**

1  can, turn to Bates 15. Have you reached it?
2     A. Yes.
3     Q. Okay. I'll tell you that I've redacted the
4  Social Security number on all of these NCO documents,
5  but otherwise they are unaltered from the produced
6  state.
7     Is this Jessica Derossett account that's
8  identified on page 15, is the account that NCO called
9  Ashley Walls' number, the 0113 number, to attempt to
10  collect?
11     A. We believed we were calling Jessica Derossett.
12     Q. Okay. Is this the account that the 0113 number
13  was called?
14     A. Yes.
15     Q. Okay. Can you look at these notes and tell me
16  where it's indicated that the 0113 number came from the
17  client?
18     A. On January 21st, 2010, we removed a home phone
19  of (314)  0113. So we moved Jessica Derossett's home
20  phone.
21     Q. Can you tell me what Bates page that's on,
22  please?
23     A. Thirty-four.
24     Q. So is that the part where it says DBT phone #

**changed from the 0113 number, and then it says to, and then I think it goes to the next line --**

A. No.

**Q. It's not --**

A. What it means, to means that it was changed to blank.

**Q. Okay. Is there some computer screen that would show what the home number was or that would demonstrate that better than this; that the 0113 number was provided to NCO by the original creditor?**

A. Well, this shows you that this was the phone number on the account that was provided for Jessica Derossett at the time of placement. There was no other phone number removed or added.

**Q. Well, I would understand that this phone number was removed in preparation for litigation.**

MS. VAN HOOSE: Object to form.

**Q. Do you know why the phone number was removed?**

A. According to the notes, we contacted someone that told us it was the wrong phone number on January 21st, 2010. And the phone number was removed once we were given information that it was a wrong phone number.

**Q. Where it says DBT phone number, what does DBT stand for?**

A. Debtor.

**Q. Have the placement files been searched as to this case; do you know?**

A. I'm not sure.

**Q. Is it accurate that typically when a -- an account is placed for collection with NCO, there's a -- either a tape or an FTP file that's received by NCO that contains the original information for each of the accounts in the portfolio?**

A. Typically, yes.

**Q. Okay. And so that -- and I would call that the placement data. Is that the term that you would use for that data?**

A. Yes.

**Q. Okay. Do you know if the placement data for this account exists?**

A. I do not. It's from 2005. I'm not sure.

**Q. Okay. If you turn to NCO 1, the first page of the document production, do you see that?**

A. Yes.

**Q. Do you know what this account is?**

A. Appears to be an account for Ashley Walls.

**Q. Were there phone calls made to Ashley Walls with regard to this call, or at least attempted phone**

**calls?**

A. Yes.

**Q. Can you tell me where they show up?**

A. Starting on NCO 005.

**Q. Looks like they were calling manually a 708 number?**

A. Yes.

**Q. Is that right?**

A. Yes.

**Q. Were there letters that were mailed by NCO to Ashley Walls?**

A. Yes.

**Q. Were there payments on this account?**

A. It appears there were.

**Q. In 2010?**

A. Yes.

**Q. When were the contacts, the successful contacts between -- strike that. I'll start over.**

**Can you tell when the first successful contact between NCO and Ms. Walls was?**

A. It appears on January 27th, 2010.

**Q. That's very close to the date that -- on the other account, on page 34, the phone number was indicated as a wrong number; do you see that?**

MS. VAN HOOSE: Object to form.

A. Yeah, I see where we were calling on Jessica Derossett. A third party told us that it was the wrong phone number for Jessica.

**Q. Does NCO know one way or the other whether it was Ashley Walls who told NCO that it was calling the wrong number?**

A. No.

**Q. Do you believe that Ashley Walls had a duty to tell NCO that it was incorrectly calling her cell phone?**

MS. VAN HOOSE: Object to form.

A. I think if she had told us on the fist attempt, that we would have removed the phone number.

**Q. Of course, Ashley probably knew that NCO was attempting to collect another debt from her at the time. Wouldn't you say that based upon the notes as to the debt that has Ashley Walls' name on it?**

MS. VAN HOOSE: Objection. Object to form.

A. I believe she could make that determination. I can't answer for Ashley.

**Q. I mean, how was Ashley supposed to know that the calls were as to a different debt than that which she was -- may have been planning on paying, but eventually did pay?**

1    MS. VAN HOOSE: He can't testify to Ashley's
2 understanding or knowledge or --
3    MR. BURKE: Well, I mean, one of the defenses
4 here is mitigation of damages. So I'm just trying
5 to learn, you know, why NCO thinks that Ashley
6 should have mitigated her damages here.
7    MS. VAN HOOSE: Well, it's a legal defense that
8 they are making. I mean, he can't testify to what
9 Ashley's knowledge was or what her belief was.
10    MR. BURKE: Right, but I'm asking him about
11 facts. And if he doesn't know, that's okay. He can
12 just say, I don't know.
13    MS. VAN HOOSE: Okay.
14    THE WITNESS: I don't know.
15    MS. VAN HOOSE: I mean, do you want to repeat
16 your question? I mean, maybe --
17 BY MR. BURKE:
18    Q. Do you have any reason to believe that Ashley
19 Walls should have known that the calls were about a
20 different debt?
21    A. I can't think for her. I would say if she
22 answered the phone, she may have been able to determine
23 that much sooner.
24    Q. At the time of the calls to the 0113 number,

22

1    So at the time of these calls from NCO to the
2 0113 number, did NCO have any policies, practices, or
3 procedures regarding the possibility that the phone
4 number it received from a creditor was the wrong number?
5    A. We do have policies.
6    Q. Okay. What are they?
7    A. When we don't have a phone number for a
8 consumer, there are policies and procedures to try to
9 locate one.
10    Q. Okay.
11    A. But we --
12    Q. What about when you do get a phone number for
13 the consumer but it's incorrect?
14    A. In this case we did not know it was incorrect.
15    Q. Right, but I'm just asking about the policies,
16 practices, and procedures. For example, I would guess
17 that it's one procedure, one policy that when somebody
18 tells you that it's a wrong number, you mark it as a
19 wrong number; would that be correct?
20    A. Yes.
21    Q. Okay. Are there any other policies, practices,
22 or procedures regarding wrong numbers as previously --
23 I'll ask the question again. That was a bad question.
24    So other than, you know, when somebody tells

24

1 did NCO have any policies, practices, or procedures
2 regarding the possibility that the number it received
3 from a creditor was the wrong phone number?
4    A. We would have no reason to believe the creditor
5 gave us the wrong phone number.
6    Q. Well, it did happen back then, that sometimes
7 phone numbers were incorrect phone numbers, right?
8    MS. VAN HOOSE: Object to form.
9    A. A number could be incorrect.
10    Q. Okay. So what I'm asking is whether there were
11 any policies, practices, or procedures regarding the
12 possibility that the number NCO received from a creditor
13 was the wrong number?
14    A. When we receive a number from the creditor,
15 that is the phone number we attempt.
16    Q. Okay. So I just want to be clear. I mean, you
17 haven't identified any policies, practices, or
18 procedures, so that's why I asked twice. I just want to
19 make clear -- and it's okay if there aren't any or there
20 weren't any. I just want to be sure I get a full answer
21 on my question. So I'm going to ask it one more time,
22 and if you don't identify any policies, practices, or
23 procedures, I'm just going to understand that there
24 weren't any.

23

1 NCO it's a wrong number, are there any other policies,
2 practices, or procedures regarding the possibility that
3 the phone number NCO received from a creditor was the
4 wrong number?
5    A. Again, when we get the phone number from the
6 creditor, we rely on that, that is the phone number for
7 the consumer that we're trying to collect, in this case
8 Jessica Derossett. We do have other procedures that
9 will provide phone numbers when we don't have a phone
10 number. So when we're told the number is bad or we
11 don't receive a phone number from a creditor, that is
12 when we would attempt the other phone numbers.
13    Q. Any other policies, practices, or procedures
14 regarding the possibility that the number received from
15 a creditor might be the wrong number?
16    A. No. Again, we rely on the number the creditor
17 gives us initially until we determine that it is the
18 wrong phone number.
19    Q. Is there anything other than waiting for
20 someone to tell NCO that the phone number is a wrong
21 phone number that NCO does to determine whether it's
22 calling the wrong number?
23    A. Again, I'll state it again. We do receive
24 skiptrace numbers. We don't attempt those unless we do

25

1   not have a phone number for the consumer.
2       **Q.  Does NCO double-check the numbers that it**
3   **receives from creditors to ensure that they're the**
4   **correct number for the debtor?**
5       A.  I don't understand double-check.
6       **Q.  I mean, you could skiptrace a number that was**
7   **given to you by the creditor, right?**
8       MS. VAN HOOSE:  Object to form.
9       **Q.  You could check it against a skiptrace, or if**
10  **it's a credit account, you might be entitled to check it**
11  **against the credit report, right?**
12      A.  Phone numbers -- I mean, phone numbers change.
13  I mean, I don't understand your question.  Again, if
14  we're given a phone number from a creditor, they are
15  typically the best source for the phone number since the
16  consumer has given them that phone number.
17      **Q.  What did you mean a second ago when you**
18  **testified that phone numbers change?**
19      A.  You've never moved and your phone number hasn't
20  changed?
21      **Q.  Do consumers' phone numbers sometimes change?**
22      A.  I would -- yes.
23      **Q.  Okay.  For example, in what circumstance might**
24  **somebody -- when might a phone number change?**

                                              26

1       A.  They move, don't pay their bill.
2       **Q.  So -- sorry.  I'm just taking a minute to look**
3   **at my notes.**
4           **How many times have you given a deposition?**
5       A.  Four or five.
6       **Q.  I think I asked a little bit about this**
7   **earlier, but I just want to sort of close the issue.**
8   **Does NCO have any reason to believe that Ashley Walls**
9   **provided prior express consent to be called at the 0113**
10  **phone number?**
11      A.  I'll state it again.  We weren't trying to call
12  Ashley Walls.  We were trying to call Jessica Derossett.
13      **Q.  Okay.  So does that mean as to Ashley Walls,**
14  **there's no reason to believe that Ashley Walls provided**
15  **prior express consent to be called on the 0113 number?**
16      MS. VAN HOOSE:  Object to form.
17      A.  Again, no.  I mean, it's -- again, it was
18  Jessica Derossett we were trying to call.  It wasn't
19  Ashley Walls.
20      **Q.  So you would agree that Ashley Walls did not**
21  **provide consent to be called on the 0113 number?**
22      MS. VAN HOOSE:  Object to form.
23      A.  If you're saying her phone number was 0113,
24  then I believe it's been answered.

                                              27

1       **Q.  So what was the answer?**
2       A.  We don't have that phone number at the time
3   listed to Ashley Walls, so the answer would be no.
4       **Q.  Okay.  Are there any other defenses that you're**
5   **aware of that NCO attempts to raise in the case other**
6   **than prior express consent and mitigation of the**
7   **damages?**
8       A.  Repeat the question.
9       **Q.  Are there any defenses that NCO intends to**
10  **raise in this case other than mitigation of damages and**
11  **prior express consent?**
12      A.  I was thinking about my last answer.  I want to
13  go back to that for a second and clarify something as
14  well.
15      **Q.  Would you answer the pending question first and**
16  **then we'll go back.  Any other defenses?**
17      A.  Not that I'm aware of.
18      **Q.  Okay.  Now, you wanted to go back to the**
19  **previous question?**
20      A.  Yeah.  You asked me if Ashley Walls gave
21  consent.
22      **Q.  Okay.**
23      A.  I have no idea if she gave consent, so I
24  can't --

                                              28

1       **Q.  You have no idea if she gave consent, is that**
2   **what you said?**
3       A.  Correct.  I don't know if she said no or yes.
4       MR. BURKE:  All right.  I think that's it for
5   today.
6           Dayle, do you have anything to add?
7       MS. VAN HOOSE:  No.
8       MR. BURKE:  Mr. Stevens, thank you very much.
9   I hope you guys can hear the jets flying overhead.
10      THE COURT REPORTER:  I heard them.
11      MR. BURKE:  It's pretty awesome.
12      THE COURT REPORTER:  Mr. Burke, this is Susan.
13  Shall I type this for you?
14      MR. BURKE:  Yeah, I think so.
15      THE COURT REPORTER:  And do you need it regular
16  time?
17      MR. BURKE:  Regular time.
18      THE COURT REPORTER:  Read or waive?
19      MS. VAN HOOSE:  Read.
20      THE COURT REPORTER:  Would you like a copy?
21      MS. VAN HOOSE:  Yes.
22      THEREUPON, the Deposition of GREG STEVENS,
23  taken at the instance of the Plaintiff, was concluded at
24  1:10 p.m.

                                              29

**Veritext Chicago Reporting Company**
**312-442-9087    800-248-3290    847-406-3200**

CERTIFICATE OF REPORTER OATH

STATE OF FLORIDA

COUNTY OF POLK

I, Susan D. Wasilewski, Registered Professional
Reporter, Certified Realtime Reporter, Certified CART
Provider, Certified Manager of Reporting Services,
Florida Professional Reporter, and Notary Public in and
for the State of Florida at large, hereby certify that
the witness named herein appeared before me on
_____, and was duly sworn.

WITNESS my hand and official seal this
_____.


_____

SUSAN D. WASILEWSKI, RPR, CRR, CCP, CMRS, FPR
NOTARY PUBLIC - STATE OF FLORIDA
MY COMMISSION NO. DD692013
EXPIRES: 10-23-11

30

---

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF POLK

I, Susan D. Wasilewski, Registered Professional
Reporter, Certified Realtime Reporter, Certified CART
Provider, Certified Manager of Reporting Services, and
Florida Professional Reporter, do hereby certify that I
was authorized to and did stenographically report the
examination of the witness named herein; that a review
of the transcript was requested; and that the foregoing
transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative,
employee, or attorney, or counsel for any of the
parties, nor am I a relative or employee of any of the
parties' attorney or counsel connected with the action,
nor am I financially interested in the outcome of this
action.

DATED THIS _____ at Lakeland, Polk
County, Florida.


_____

SUSAN D. WASILEWSKI, RPR, CRR, CCP, CMRS, FPR

31

---

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE

IN RE: Ashley Walls v. NCO Financial Systems, Inc.
CASE NO.: 1:10-cv-2542
DEPOSITION OF GREG STEVENS
TAKEN AUGUST 18, 2011

PAGE #/LINE #   CHANGE                    REASON

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

_____    _____

GREG STEVENS                         DATE

cc: Alexander H. Burke, Esq.
    James Schultz, Esq.

32

---

**Veritext Chicago Reporting Company**
**312-442-9087     800-248-3290     847-406-3200**

# Exhibit E



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALAN DONNELLY, on behalf     )
of himself and others        )
similarly situated,          )
        Plaintiffs,          )
vs.                          )   No. 09 C 2264
NCO FINANCIAL SYSTEMS,       )
INC.,                        )
        Defendant.           )

        The 30(b)(6) deposition of NCO FINANCIAL
SYSTEMS, by GREGORY STEVENS, called for examination,
taken pursuant to the Federal Rules of Civil
Procedure of the United States District Courts
pertaining to the taking of depositions, taken
before LINDA A. WALICZEK, CSR No. 84-3865 a Notary
Public within and for the County of Cook, State of
Illinois, and a Certified Shorthand Reporter of said
state, at Suite 600, 155 North Michigan Avenue,
Chicago, Illinois, on the 21st day of January, A.D.
2010, at 9:00 a.m.

**2**

1   PRESENT:
2
3       BURKE LAW OFFICES, LLC,
4       (155 North Michigan Avenue, Suite 732,
5       Chicago, Illinois 60601,
6       312-729-5288), by:
7       MR. ALEXANDER H. BURKE,
8           appeared on behalf of the Plaintiffs;
9
10      SESSIONS FISHMAN NATHAN & ISRAEL, LLP,
11      (55 West Monroe Street, Suite 1120,
12      Chicago, Illinois 60603,
13      312-578-0990), by:
14      MR. JAMES K. SCHULTZ and
15      MR. BRYAN C. SHARTLE,
16          appeared on behalf of the Defendant.
17
18
19
20
21
22
23  REPORTED BY: LINDA A. WALICZEK, C.S.R.
24      CERTIFICATE NO. 84-3865.

**3**

1       (WHEREUPON, the witness was duly
2       sworn.)
3   MR. BURKE: Mark this as Exhibit 1, please.
4       (WHEREUPON, a certain document was
5       marked Stevens Exhibit No. 1, for
6       identification, as of 01/21/10.)
7       (WHEREUPON, the document was
8       tendered to the witness.);
9       GREGORY STEVENS,
10  called as a witness herein, having been first duly
11  sworn, was examined and testified as follows:
12      EXAMINATION
13  BY MR. BURKE:
14      Q.   Would you please read what's been handed
15  to you as Exhibit 1, and then let me know if you
16  have any questions.
17      A.   Okay.
18      Q.   Do you have any questions?
19      A.   No.
20      Q.   Do you agree to follow these
21  instructions?
22      A.   Yes.
23      Q.   Would you state your name.
24      A.   Greg Stevens.

**4**

1       Q.   And, Mr. Stevens, where are you employed?
2       A.   NCO Financial Systems.
3   MR. BURKE: We're here today for the 30(b)(6)
4   deposition pursuant to notice, which I'm handing
5   to the court reporter to be marked as Exhibit 2.
6       (WHEREUPON, a certain document was
7       marked Stevens Exhibit No. 2, for
8       identification, as of 01/21/10.)
9       (WHEREUPON, the document was
10      tendered to the witness.)
11  BY MR. BURKE:
12      Q.   Do you understand you're being produced
13  as a representative of NCO Financial Systems
14  today?
15      A.   Yes, I do.
16      Q.   Have you seen the document marked as
17  Exhibit 2 before?
18      A.   Yes, I have.
19      Q.   Is it your understanding that you're
20  being produced as a witness to testify on behalf of
21  NCO Financial Systems with respect to the topics
22  that are listed on pages 1 and 2 of Exhibit 2?
23      A.   Yes.
24      Q.   Are there any subjects or topics that are

GREGORY STEVENS · JANUARY 21, 2010

## 5

1  listed anywhere in Exhibit 2 that you are not
2  competent to testify about today on behalf of NCO
3  Financial Systems, Incorporated?
4      A.   No.
5      Q.   Where is your office with NCO Financial
6  Systems, Incorporated?
7      A.   My office is located in Tampa, Florida.
8      Q.   And for the purposes of today's
9  deposition, when I refer to NCO, please take it to
10  mean NCO Financial Systems, Incorporated.  Okay?
11      A.   Yes.
12      Q.   You said Tampa?
13      A.   Correct.
14      Q.   And what is your position with NCO?
15      A.   Vice president of customer contact
16  management.
17      Q.   What does that mean?
18      A.   I oversee dialers, IVR and web, anything
19  where the customer contacts NCO.
20      Q.   What is IVR?
21      A.   It's a term we use for companies that
22  dial accounts for us.
23      Q.   Does that stand for something?
24      A.   In the text where we use it, it's

## 6

1  basically we call these third-party companies, IVR.
2  They make calls for us based on lists that we send
3  them.
4      Q.   And what are the IVR companies?
5      A.   SoundBite and LiveVox, L-i-v-e, Vox.
6      Q.   And when you said you oversee the
7  dialers, what did you mean?
8      A.   I have a team of representatives that
9  report to me that maintain the function of the
10  dialer, deal with setups, programing.
11      Q.   What is a dialer?
12      A.   Our dialers, it's very simple.  They're
13  basically like a telephone switch.  They have T1
14  cards installed in them that are hooked to a
15  long-distance company, and there's line-side cards
16  that are hooked to our telephone switch.  Those
17  cards hook to our switch, drive the call back to the
18  collector's phone at their desk.
19      Q.   So somewhere in the process a telephone
20  number is dialed, right?
21      A.   Correct.
22      Q.   How is phone number dialed?
23      A.   The phone number is dialed based on the
24  host system provides a list of accounts to the

## 7

1  dialer.  Once it receives that list of accounts,
2  based on selection criteria that we determined, the
3  dialer receives that information, receives a phone
4  number and dials the accounts.
5      Q.   So is there any human being that dials
6  the phone number?
7      A.   No.
8      Q.   How long have you worked at NCO?
9      A.   I've worked at NCO since 1998.
10      Q.   What was your first position at NCO?
11      A.   Vice president of operations.
12      Q.   How many positions have you had since
13  1998 and 2010?
14      A.   Two.
15      Q.   So VP of operations and now VP for
16  customer contact management?
17      A.   Correct.
18      Q.   Was it a promotion from your first
19  position to your second?
20      A.   Yes.
21      Q.   When did that happen?
22      A.   Approximately three years ago.
23      Q.   So 2007?
24      A.   Correct.

## 8

1      Q.   Was there a vice president for customer
2  contact management before you?
3      A.   No.
4      Q.   Did your duties as the VP of operations
5

GREGORY STEVENS                      JANUARY 21, 2010

## 13



12  Q.   Does NCO have a system that keeps track
13  of debtors, like a computer system?
14  A.   Yes.
15  Q.   Is that the FACS system?
16  A.   We have two systems, FACS and CRS.
17  Q.   FACS is F-A-C-S?
18  A.   Yes.
19  Q.   And are those essentially databases?
20  A.   Yes.
21  Q.   Why are there two systems?
22  A.   Just through different acquisitions,
23  depends on what type of business was on each, and
24  they kept the two systems.

## 14

1   Q.   Are you familiar with the plaintiff in
2   this case, Alan Donnelley?
3   MR. SHARTLE:  Object to the form.
4   BY MR. BURKE:
5   Q.   Are you familiar -- have you ever heard
6   of Alan Donnelley?
7   A.   Yes.
8   Q.   Are you aware that he's the plaintiff in
9   this case?
10  A.   Yes.
11  Q.   Have you reviewed documents and files
12  having to do with Alan Donnelly?
13  A.   Yes.
14  Q.   Do you know what system Alan Donnelly's
15  file exists on?
16  A.   Yes.
17  Q.   Which system?
18  A.   CRS.
19  Q.   Do you have an idea about how many active
20  accounts exists on the CRS system right now?
21  A.   Approximately 125 million, maybe.
22  Q.   And how about on the FACS system?
23  A.   Twenty-five million.  I'm not sure those
24  are exact.

## 15

1   Q.   You testified earlier that there are two
2   IVR dialers, SoundBite and LiveVox.
3   Does NCO also have in-house dialers?
4   A.   Yes.
5   Q.   What are those dialers called?
6   A.   CRS Mercury.  It's together CRS Mercury.
7   Q.   That's one?
8   A.   You have FACS guaranteed contacts and
9   Aspect.
10  Q.   Why does NCO have three in-house dialers?
11  A.   The FACS dialer communicates with FACS
12  only.  It's based off their host system.
13  The CRS works off the CRS system.  It's
14  integrated.  The Aspect dialer is just part of some
15  acquisitions, and they kept the asset.
16  Q.   With respect to the CRS Mercury system,
17  does that system also dial numbers without a human
18  dialing the numbers?  I'll restate the question.
19  I think you testified earlier that the
20  SoundBite and the LiveVox systems both dial
21  phone numbers without human intervention, is that
22  correct?
23  A.   They dial numbers only from a list that
24  we send them, correct.

## 16

1   Q.   Does the CRS Mercury system similarly
2   dial numbers without human intervention?
3   A.   Yes.  It operates off the host system
4   without with a list.
5   Q.   And how about the FACS guaranteed contact
6   dialer?
7   A.   Yes.
8   Q.   Does the FACS guaranteed dialer -- I'll
9   start over.
10  Does the FACS guaranteed contacts
11  dialer dial telephone numbers without human
12  intervention?
13  A.   Yes.  It works off of the host system on
14  a list it provides, yes.
15  Q.   And does the Aspect dialer dial telephone
16  numbers without human intervention?
17  A.   Yes.  Provided a list from the host
18  systems, correct.
19  MR. BURKE:  This is Exhibit 3.
20  (WHEREUPON, a certain document was
21  marked Stevens Exhibit No. 3, for
22  identification, as of 01/21/10.)
23  (WHEREUPON, the document was
24  tendered to the witness.)

GREGORY STEVENS                                         JANUARY 21, 2010

---

### 25

```
 1   BY MR. BURKE:
 2
```

```
 8        Q.   You testified a moment ago that it's your
 9   belief that NCO clients only provide telephone
10   numbers to NCO that the customer provided prior
11   express consent to receive auto dialed and
12   prerecorded messages, is that correct?
13        A.   Correct.
14        Q.   How do you know that?
15        A.   We rely on what the client gives us.
16        Q.   Why does NCO believe that it's entitled
17   to rely on that?
18        A.   Based on our interpretation of the TCPA
19   where if it's the original phone number given to the
20   client, that there's expressed consent given.
21        Q.   Does NCO have any information as to
22   whether the telephone numbers that are provided to
23   NCO are the telephone numbers that NCO's clients
24   received from consumers?
```

### 26

```
 1        A.   We get the original placement record from
 2   the client, and that number is what we believe that
 3   the consumer has given the client.
 4        Q.   Why do you believe that?
 5        A.   Because it's the number the client gave
 6   us.
 7        Q.   But how do you know that those are the
 8   phone numbers that the consumers gave your
 9   clients?
10        A.   We rely on the client to provide the
11   number the consumers given them to contact them.
12        Q.   Is there some contract between NCO and
13   its clients that specifies that the telephone
14   numbers that the clients provide to NCO are the
15   telephone numbers that the client's customers
16   provided consent to receive auto dialed or
17   prerecorded messages on?
18        A.   That was a long question.  So --
19        MR. SHARTLE:  If you understand, if not --
20   BY THE WITNESS:
21        A.   Yeah.  Can you rephrase it?
22        MR. BURKE:  Would you just reread it, please?
23             (WHEREUPON, the record was read by
24             the reporter.)
```

### 27

```
 1   BY THE WITNESS:
 2        A.   Not that I'm aware of.
 3   BY MR. BURKE:
 4        Q.   Is there some other reason why NCO thinks
 5   that the telephone numbers that are provided to NCO
 6   by NCO's clients are numbers that the customer
 7   provided prior expressed consent to receive auto
 8   dialed or prerecorded message calls?
 9        A.   The term auto dialed and prerecorded
10   messages, I think we have a different interpretation
11   of what that means as far as TCPA.
12        Q.   Well, for purposes of this deposition,
13   when I say "auto dialed," I mean using the
14   SoundBite, LiveVox, CRS Mercury, FACS or Aspect
15   dialers in the manner that we discussed earlier.
16             So with that in mind, would you please
17   answer the question that I asked before, and
18   I'm going to ask the court reporter again to read
19   it.
20             (WHEREUPON, the record was read by
21             the reporter.)
22   BY THE WITNESS:
23        A.   No.
24
```

### 28

```
 1   BY MR. BURKE:
 2        Q.   When NCO uses its dialers -- and when I
 3   say "dialers," I mean the SoundBite, the LiveVox,
 4   the CRS Mercury, the FACS, and the Aspect dialers.
 5   When NCO uses its dialers to call NCO debtors, does
 6   NCO mean to make those telephone calls?  Does it
 7   intend to make those telephone calls?
 8        A.   To those specific consumers, yes.
 9        Q.   Directing your attention to Exhibit 3,
10   paragraph four, would you read the first sentence of
11   paragraph four, please?
12        A.   "In this case, the telephone number that
13   NCO called to reach the plaintiff was the number
14   provided to NCO by the original creditor, Acute Care
15   Specialists, Inc."
16        Q.   Is that statement true?
17        A.   Yes.
18        Q.   How do you know?
19        A.   I've looked at the documents, the
20   placement document for that particular account, for
21   Mr. Donnelly's account.  I also reviewed an
22   affidavit from Acute Care Specialists attesting that
23   that was the original phone number given to them and
24   then handed over to NCO.
```

# Exhibit F

(recordings of phone messages will be provided directly to the Court)